UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LACKAWANNA CHAPTER OF THE ) | |
| RAILWAY & LOCOMOTIVE HISTORICAL ) | |
| SOCIETY, INC., and ) | |
| THE FRIENDS OF THE NEW JERSEY ) | |
| RAILROAD AND TRANSPORTATION ) | |
| MUSEUM COMMISSION, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | No. 4:04CV734-SNL |
| ) | |
| ST. LOUIS COUNTY, MISSOURI d/b/a ) | |
| Museum of Transportation, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Before the court is the motion for summary judgment filed by defendant St. Louis County, Missouri, d/b/a Museum of Transportation (hereinafter the County). This is a dispute over the ownership of an historic steam locomotive, Locomotive No. 952. The locomotive and its tender weigh about 106 tons; the locomotive is not currently operable and is located at the Museum of Transportation, in St. Louis County, Missouri, (off Barrett Station Road in Kirkwood, Missouri).

The following factual and procedural history is taken from pleadings filed by the parties (including the second amended complaint) and prior orders entered by the United States District Court for the Middle District of Pennsylvania (per Chief District Judge Thomas I. Vanaskie) and this court.

Plaintiffs filed this lawsuit in federal district court in Pennsylvania on June 10, 2002,

against the County. Plaintiffs are the Lackawanna Chapter of the Railway & Locomotive Historical Society, Inc., a Pennsylvania not-for-profit corporation with its principal place of business located in Mountainhome, Pennsylvania (hereinafter the Lackawanna Chapter), and The Friends of the New Jersey Railroad and Transportation Commission, Inc., a New Jersey not-for-profit corporation with its principal place of business in Phillipsburg, New Jersey (hereinafter Friends). The County is a charter county organized under the laws of Missouri and owns and operates the Museum of Transportation.

Plaintiffs allege that they are the owners of No. 952, which is now in the wrongful possession of the County at the Museum of Transportation. Plaintiffs claim ownership of the locomotive and a right to demand its return based on their position as successors in interest pursuant to a 1953 loan agreement in which the RLHS (the Lackawanna Chapter's predecessor in interest) allegedly conveyed the locomotive to the museum (the county's predecessor in interest) on an "indefinite loan" basis for "permanent public display," but without transferring ownership. Plaintiffs allege that the County has refused their request to return the locomotive.

For the reasons discussed below, the court grants the motion for summary judgment in favor of the County.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Excalibur Group, Inc. v. City of Minneapolis, 116 F.3d 1216, 1219 (8th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)), cert. denied, 522 U.S. 1077 (1998). A summary judgment motion "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time

for those that really do raise genuine issues of material fact." City of Mount Pleasant v. Associated Electric Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988) (Mount Pleasant).

Pursuant to Fed. R. Civ. P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962). The burden is on the moving party. Mount Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983), abrogated on other grounds, 504 U.S. 158 (1992). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With this standard in mind, the court now examines the facts of this case.

## BACKGROUND

The American Locomotive Co. of Schenectady, New York, manufactured No. 952 for the Delaware, Lackawanna & Western Railroad Co. (hereinafter Lackawanna Railroad) around 1905.

3

The No. 952 was one of four "900 Series" steam locomotives used in connection with the Lackawanna Railroad's public relations effort to encourage the public to ride the railroad. Anthracite coal was considered to be a clean-burning coal that produced very little smoke and cinders.

The Lackawanna Railroad introduced a fictional passenger, "Phoebe Snow," and created the slogan "My gown stays white from morn to night upon the road of anthracite."

No. 952 is known as a "camelback" locomotive because the engineer's cabin controls were located in the middle of the boiler. The vast majority of steam locomotives manufactured during that time had the cabin controls located at the end of the firebox. The location of the engineer's cabin in the middle of the boiler permitted a "camelback" locomotive to use wide fireboxes in order to burn anthracite coal. "Camelback" locomotives were used in the anthracite coal regions of northeastern Pennsylvania. The Lackawanna Railroad used No. 952 in active service from 1905 to 1938 when it was "retired." In an agreement dated April 17, 1939, the Lackawanna Railroad transferred ownership of No. 952 to the Railway & Locomotive Historical Society, Inc. (hereinafter RLHS), a Massachusetts corporation, subject to certain conditions, one of which was that No.952 was to be used by RLHS for exhibition or as a museum piece. No. 952 was to be preserved as an "object of historical and scientific interest."

In 1939-1940 No. 952 was placed on display at the World's Fair in New York City. In 1951, in connection with the 100th anniversary of the Lackawanna Railroad, No. 952 was placed on display in the former Lackawanna Railroad yard in Scranton, Pennsylvania, which is now the Steamtown National Historic Park. Steamtown USA was a private railroad museum in New Hampshire. In the 1980s Steamtown USA was relocated in Scranton and in 1986 was acquired

by the National Park Service, Department of the Interior, as the Steamtown National Historic Site.

The Lackawanna Railroad sold the Scranton rail yard (the railroad had built a new diesel shop and a manufacturing company had bought the railroad's old "back shop," where No. 952 had been stored). The railroad notified RLHS that No. 952 had to be moved. What happened next is in dispute. Plaintiffs allege that in 1952 John Roberts of St. Louis, Missouri, the owner of a private railroad museum then known as the "St. Louis Museum of Transport," requested that No. 952 be placed on display at his museum. Second amended complaint ¶ 14. Plaintiffs allege that, in April 1953, with the consent of the Lackawanna Railroad, John Roberts and RLHS agreed that No. 952 would be placed on "permanent public exhibition" at the museum in St. Louis on an "indefinite loan" basis, but with ownership being retained by RLHS. Id. ¶ 15. Several railroads transported No. 952 without charge as educational material, and it arrived at the museum near St. Louis on May 7, 1953.

The exact nature of the transfer is unclear. Correspondence describes the transfer variously as a "permanent loan" or as an "indefinite loan" or for "permanent public exhibition." In a letter dated October 31, 1952, the RLHS offered No. 952 to the museum as a "permanent loan." Defendant's Exs. D; I (letter dated Jan. 23, 1953 from RLHS referring to the "possibility" of the museum's accepting "on a permanent loan basis" No. 952); see also Defendant's Exs. K (letter dated Feb. 6, 1953 from RLHS appreciating museum's offer to care for No. 952 on a "permanent loan basis" and stating "I hate to see the locomotive leave her home rails but your museum is the place for her if she gets turned out of house and home."), L (letter dated Mar. 2, 1953 from the railroad noting the museum's acceptance of No. 952), M (letter dated Mar. 11, 1953 from the

5

museum anticipating shipment of the RLHS's No. 952 for "permanent public exhibition" and stating that "we shall be happy to provide haven for this valued relic and are prepared to accept shipment"); Plaintiffs' Ex. TTTT (letter dated May 30, 2002, from counsel representing the Lackawanna Chapter to the County, referring to "indefinite loan" with "ownership retained" by RLHS).

In 1979 John Roberts had financial problems and transferred his entire museum collection by lease to the St. Louis County Department of Parks and Recreation. The County exercised its option to acquire the museum as a gift in February 1984.

Plaintiffs allege that the museum failed to take proper care of No. 952. They allege that No. 952 was placed on an unused track and left exposed to the weather, where it began to deteriorate and was surrounded by weeds and debris. Id. ¶ 17. Locomotive enthusiasts became alarmed. In 1993 and 1994, officers of the RLHS visited the museum several times and expressed their concern about the poor condition of No. 952. On January 7, 1995, a photograph of No. 952 appeared in a local newspaper, showing the poor condition of the locomotive. On May 30, 1996, the RLHS Board of Directors adopted a resolution that it would transfer its ownership of No. 952 to any responsible organization that "would protect the locomotive against further deterioration, restore and conserve it for future display, and return the locomotive to the service territory of the Lackawanna Railroad with the expectation and intent that the locomotive would be placed on display in Scranton, Pennsylvania (at the Steamtown National Historic Site)." Id. ¶ 18.

RLHS believed that it owned No. 952 and wanted the museum to return it. RLHS suggested a trade of No. 952 for another historic locomotive with midwestern connections. The museum was committed to keeping No. 952 and was not interested in a trade for another

6

locomotive.

The Lackawanna Chapter was incorporated in December 1997 and was approved as a chapter of the RLHS. In 1999 the RLHS Board of Directors approved the execution of a gift deed that transferred all of its right, title, and interest in No. 952 to the Lackawanna Chapter and Friends, subject to certain conditions, such as the removal of the locomotive from the museum and its restoration, conservation and display in the Lackawanna Railroad territory (at Steamtown). Id. ¶ 20. Plaintiffs allege that, in 1999, in response to a resolution passed by the General Assembly of Pennsylvania seeking the release of No. 952 to its rightful owner for its return to the Lackawanna Railroad's territory, the museum moved No. 952 to another area of the museum. Id. ¶ 21. According to plaintiffs, on January 4, 2002, the County refused to return No. 952 to plaintiffs.

On June 10, 2002, plaintiffs filed this action in federal court in the Middle District of Pennsylvania. In June 2004 Friends transferred its interest to the Lackawanna Chapter.

Plaintiffs' initial complaint alleged claims of breach of contract, conversion and due process violations. Plaintiffs sought specific performance of the alleged "indefinite loan" agreement, replevin, and damages for "wrongful detention." The County filed a motion to dismiss or transfer for improper venue. The district court agreed that venue was improper, because "no substantial part of the events or omissions" occurred in the Middle District of Pennsylvania, and transferred the case to the Eastern District of Missouri. Lackawanna Chapter of the Railway & Locomotive Historical Society, Inc. v. St. Louis County, No. 3:CV-02-0994, 2004 WL 503447, at *5 (M.D. Pa. Mar. 12, 2004) (Lackawanna), citing Cottman Transmission Systems, Inc. v. Martino, 36 F.3d 291, 294-95 (3d Cir. 1994) (28 U.S.C. § 1406(a) provides that

7

district court of district in which is filed a case laying venue in the wrong district shall dismiss, or if it be in the interest of justice, transfer such case to any district in which it could have been brought).

The court noted that the place of performance is in Missouri because the 1953 loan agreement between John Roberts and RLHS allegedly provided that No. 952 would be placed on display in St. Louis. There was no evidence that when the loan agreement was formed No. 952 was in Pennsylvania or that there was then an expectation of its return to Pennsylvania, and at that time No. 952 was owned by RLHS, a Massachusetts corporation. Lackawanna, at *3. The court noted that the Lackawanna Chapter, the only party in the case with Pennsylvania citizenship, did not even exist when the 1953 loan agreement was made. Id. The court noted that there was no evidence that the 1953 loan agreement was somehow connected to Pennsylvania or expressed any intention eventually to return No. 952 to Pennsylvania. Id. The court decided that the 1999 transfer from RLHS to the Lackawanna Chapter was not a "substantial event" that occurred in Pennsylvania for purposes of venue for the breach of contract claim. Id. The court further observed that the case centers on a loan agreement, on which the court noted that plaintiffs "heavily rely" but had yet to produce, between a Missouri resident (Roberts) and a Massachusetts corporation (RLHS). Id.

In this district, after the County filed its first motion to dismiss for failure to state a claim, plaintiffs voluntarily withdrew their claims for conversion and procedural due process and filed a second amended complaint for replevin, specific performance of the 1953 loan agreement, and damages for a deprivation of substantive due process in violation of 42 U.S.C. § 1983. The County then filed an answer and a second motion to dismiss for failure to state a claim for breach

8

of contract and deprivation of substantive due process.

In May 2005 the court denied the first motion to dismiss the first amended complaint as moot. Slip op. at 2 n.1 (May 13, 2005). The court denied the motion to dismiss the breach of contract claim because it did not appear beyond a reasonable doubt that plaintiffs can prove no set of facts in support of that claim. Id. at 7 (noting that the court could reasonably infer that some type of evidence on material points supporting a claim for breach of contract will be introduced at trial). However, the court agreed with the county that the facts as alleged in the second amended complaint did not support the conclusion that the county's decision to retain possession of No. 952 was a government action that was sufficiently outrageous or truly irrational, or something more than arbitrary, capricious, or a violation of state law in support of a substantive due process claim, or shocked the conscience or offended judicial notions of fairness or human dignity, or interfered with rights implicit in the concept of ordered liberty. Id. at 9. The court concluded with the observation that plaintiffs' claim that the County's refusal to return No. 952 alleged state law violations. Id. at 10.

The County then filed a motion for summary judgment supported by a memorandum (Document No. 56) and numerous exhibits. The County argues that plaintiffs lack standing, plaintiffs' action is barred by the applicable Missouri statute of limitations, the deed of gift was void, the County is entitled to sovereign immunity, plaintiffs abandoned the locomotive, and there is no enforceable contract between plaintiffs and the County because of the statute of frauds. The County filed a statement of "uncontroverted material facts" in support of its motion for summary judgment (Document No. 55). Plaintiffs filed a motion in opposition to the motion for summary judgment and numerous exhibits. Document No. 61. Plaintiffs argue that there are

9

questions of material fact, which preclude summary judgment, such as whether the RLHS intended to abandon the locomotive, whether the County adversely possessed the locomotive, whether the gift deed contained conditions subsequent or conditions precedent, and when plaintiffs demanded the return of the locomotive. The County filed a reply (Document No. 68).

The case was scheduled for jury trial in May 2006. However, the court removed the case from the docket in order to rule on the motion for summary judgment.

## DISCUSSION

As a preliminary matter, the court notes that the Friends no longer have any interest in No. 952 in light of the June 2004 transfer of their interest (if any) in the locomotive to the Lackawanna Chapter. The Lackawanna Chapter agrees that the Friends can be dismissed from the case. Memorandum in opposition, at 10. Accordingly, the court dismisses the Friends from the case.

Plaintiffs based federal jurisdiction on the existence of a federal question and diversity of citizenship. Second amended complaint, ¶ 2. As noted above, the court has dismissed the substantive due process claim, and the remaining claims involve only state law issues. Plaintiffs have alleged that the amount in controversy exceeds $75,000, exclusive of interest and costs. Id. ¶ 4.

No choice of law provision has been cited to the court. The Middle District of Pennsylvania transferred the case to this district for improper venue. 28 U.S.C. § 1406(a). "Which state law applies in a diversity case that has been transferred between federal courts is determined by the nature of the transfer." Pony Computer, Inc. v. Equus Computer Systems of Missouri, Inc., 162 F.3d 991, 995 (8th Cir. 1998) (Pony Computer), citing Wisland v. Admiral Beverage Corp., 119

10

F.3d 733, 735-36 (8th Cir. 1997) (noting that in a § 1404(a) transfer, the law of the transferor court applies, but in a § 1406(a) transfer, the law of the transferee court applies), cert. denied, 522 U.S. 1112 (1998). Because this case was transferred pursuant to 28 U.S.C. § 1406(a), the court applies the law of the transferee court, Missouri, including Missouri choice of law rules.

Missouri follows the most significant relationship rule in conflicts of law in tort and contract actions. E.g., Birnstill v. Home Savings of America, 907 F.2d 795, 797 (8th Cir. 1990) (noting Missouri law follows Restatement (Second) of Conflicts of Law); see also Pony Computer, 162 F.3d at 995, citing D.L.C. v. Walsh, 908 S.W.2d 791, 794 (Mo. Ct. App. 1995).

To resolve a contract claim where the contract is silent on choice of law, §188(2) of the Restatement provides that the following factors should be considered:

> (a) the place of contracting; (b) the place of negotiation;
>
> (c) the place of performance; (d) the location of the subject
>
> matter of the contract; and (e) the domicile, residence,
>
> nationality, place of incorporation and place of business
>
> of the parties.

To resolve a tort claim, the court must evaluate the following contacts listed in § 145 of the Restatement: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. Where the place of conduct and the place of injury occur in two different states, Missouri choice of law rules dictate that the place where the act takes harmful effect or produces the result complained of is the more significant contact.
Id. (citations omitted).

11

As noted by plaintiffs in their memorandum in opposition at 10, the second amended complaint does not include a claim for conversion. The second amended complaint sets forth three counts that somewhat overlap. Count I alleges that plaintiffs own No. 952, that plaintiffs have a right to immediate possession and the County is in wrongful possession of No. 952, and seeks replevin and damages for "wrongful detention." Count II alleges the County's refusal to return No. 952 is a breach of the 1953 "indefinite loan" agreement and seeks specific performance (the return of No. 952, which plaintiffs describe as "unique property"). Count III alleges that the county's refusal to return No. 952 constitutes a deprivation of substantive due process and seeks replevin, specific performance, and damages, and any further relief.

However, in their memorandum in opposition, plaintiffs describe the second amended complaint as containing only two counts—for replevin and for specific performance of a "contractual obligation" to return No. 952 (the 1953 "indefinite loan" agreement). Id. The court notes that the substantive due process claim has been dismissed. For purposes of analysis, we read the second amended complaint to state a tort claim for replevin and a claim for breach of contract.

Like Chief Judge Vanaskie for the Middle District of Pennsylvania, the court notes that but for the state of incorporation of RLHS (Massachusetts), Missouri is the only state with a relationship with either the contract or tort claim. In 1953 the museum was a Missouri corporation. The museum is located in Missouri. Its successor, St. Louis County, is a Missouri county. The parties to the 1953 loan agreement were the RLHS and the president of the museum, a Missouri resident. The 1953 loan agreement was to be performed in Missouri. No. 952 was shipped to the museum in Missouri and has been physically located in Missouri since 1953. The

12

alleged neglect of No. 952 occurred in Missouri. The refusal to return No. 952 occurred in Missouri. The place of negotiation of the 1953 loan agreement is not known, and the individuals involved in the negotiations have died. The parties agree that Missouri law applies. Memorandum in support, at 6-7; Memorandum in opposition, at 10.

As noted above, plaintiffs claim that they are the owners of No. 952 and have the right to demand that the museum return it as the successors in interest to the 1953 loan agreement. Plaintiffs allege that in the 1953 loan agreement RLHS conveyed No. 952 to the museum on an "indefinite loan" basis but retained ownership. Second amended complaint, ¶ 15. Plaintiffs have not produced the 1953 loan agreement. Plaintiffs rely on Exhibits D and F as evidence of the RLHS's offer of a loan, memorandum in opposition, at 3, and Exhibits O, P, and Q as evidence of the museum's acceptance of the loan for "permanent public exhibition." Id.

In support of its motion for summary judgment, the County specifically argues that "[t]here is no contract or written agreement between the museum and the RLHS regarding the transfer of the locomotive." Memorandum in support of motion for summary judgment, at 4. The County argues that it is entitled to judgment as a matter of law because plaintiffs lack standing, plaintiffs' action is barred by the five-year statute of limitations applicable to conversion and breach of contract claims, RLHS's 1999 gift deed to plaintiffs was void because the locomotive was in the adverse possession of the museum, the County is protected by sovereign immunity, RLHS abandoned No. 952 for more than 40 years and did not reserve the right to retake possession, and the agreement is not in writing as required by state law.

In opposition, plaintiffs argue that there are questions of material fact or law that preclude summary judgment. Plaintiffs argue there is a question of fact whether RLHS transferred No.

13

952 with the intent to abandon it or with the intent to loan it to the museum for permanent public exhibition. Plaintiffs also argue that the 1999 constructive gift was complete with delivery of the gift deed. Plaintiffs argue that the Lackawanna Chapter has an interest in No. 952 because the conditions to the 1999 gift were conditions subsequent and not conditions precedent. Plaintiffs also argue that there is a question of fact whether the RLHS demanded possession of No. 952 at any time before May 2002. Plaintiffs argue that the correspondence constituted negotiations that did not start the running of the statute of limitations. Finally, plaintiffs argue that the transfer of No. 952 in 1953 was an implied bailment for purposes of exhibition and that the 1984 bill of sale from the museum to the county (Plaintiffs' Exhibit SSSS) satisfies the Statute of Frauds.

Plaintiffs and the County have submitted voluminous supporting documents. The court has carefully reviewed the documents. Some of the documents refer to the transfer of the locomotive; other documents refer to what the parties believed were the terms of the transfer. None of the documents establish a loan agreement between the RLHS and the museum setting forth the terms of the transfer of the locomotive in 1953. In particular, the court has reviewed the exhibits cited by plaintiffs in the second amended complaint. Exhibit D is a July 1982 letter from John Willever of the RLHS to John Roberts of the museum discussing the museum's refusal of the RLHS's proposal to restore No. 952 to operating condition. Exhibit F is an August 1986 letter from John Roberts to Leonard Chicco (of the Steamtown Foundation) noting that "the owner, St. Louis County, and the supporting Transport Museum Association" are not interested in "deaccessioning" the locomotive. Exhibit O is a September 1990 letter from Willever to James Cunningham that states that "[t]he best information that I have is that the R&LHS never relinquished title to the locomotive; and that the DL&W sent it to St. Louis for safekeeping since

14

R&LHS had no place to store or display it. To date, I have found no evidence that R&LHS ever conveyed title to the locomotive to St. Louis . . . ." Exhibit P is a note from Willever stating that "Steamtown will need a release of all right, title, and interest (if any) that R&LHS has in and to 952." Exhibit Q is an October 1990 letter from Willever to Thomas Taber stating that the uncertainty about ownership of No. 952 arises after 1951. According to the letter, "[t]he un-answered question is did anyone from R&LHS back in 1951 agree to give back 952 to DL&W; or was there some other arrangement either oral or written whereby DL&W had the authority to transfer it to St. Louis as (1) a gift; or (2) for safekeeping?"

Other documents submitted by the County refer to lack of documentation of the transfer of No. 952 from RLHS to the museum. A January 2006 affidavit of Arthur Lloyd, the executive vice-president of the RLHS, states that "[I]n 1953, the RLHS sent the 952 to the museum as a permanent loan. To the best of my knowledge, there is no contract, formal agreement or instrument concerning this transfer to the museum." To the same effect is a January 2006 affidavit of William Howes, Jr., the vice-president for member services of RLHS, and a February 2006 affidavit of Molly Butterworth, the curator of the museum. Defendant's Exhibit D, an October 1952 letter from Charles E. Fisher, the president of RLHS, asks whether the museum "would want [No. 952] in the nature of a permanent loan." Defendant's exhibit F, a November 1952 letter from Dr. John Smith to the RLHS states that the museum favors acceptance of No. 952 as a "temporary or permanent loan." Defendant's Exhibit H, a letter from W.G. White, the president of the Lackawanna Railroad, refers to No. 952 as the "property of the [RLHS]." Defendant's Exhibit I, a January 1953 letter from Charles E. Fisher, the president of RLHS, to Dr. John Smith, of the museum, refers to the "possibility of the Museum of Transport accepting

15

on a permanent loan basis, our DL&W locomotive #952."

It can be inferred from these documents that the RLHS transferred No. 952 to the museum on a "permanent loan" basis. Many of the letters refer to the museum's acceptance of No. 952 as a "permanent loan." For example, Defendant's Exhibit RR, a May 1996 letter from the director of the museum to the RLHS, describes the transfer as a permanent loan "rather than a transfer of ownership" and that "the museum recognized that the important objective was to save the engine, not insist on ownership before transfer." As noted above, Plaintiffs' Exhibit TTTT, a May 2002 letter from attorneys representing the Lackawanna Chapter to the county, refers to "an agreement made in 1953" transferring No. 952 to the museum on an "indefinite loan" basis for display, "with ownership retained by RLHS." It is unclear what the terms "permanent loan" or "indefinite loan" mean.

Even assuming for purposes of argument that there was an agreement between RLHS and the museum to loan No. 952 to the museum on an indefinite or permanent loan basis, plaintiffs cannot enforce any such agreement because the agreement is not in writing as required by the Missouri statute of frauds:

> No action shall be brought to charge any executor or administrator, upon any special promise to answer for any debt or damages out of his own estate, or to charge any person upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made in consideration of marriage, or upon any contract made for the sale of lands, tenements, hereditaments, or any interest in or concerning them, or any lease thereof, for a longer time than one year, or upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized, and no contract

16

> for the sale of lands made by an agent shall be binding upon the
> principal, unless such agent is authorized in writing to make said
> contract.

R.S. Mo. § 432.010.

In addition, another law, R.S. Mo. § 432.070, applies to counties and similarly requires that contracts be in writing:

> No county, city, town, village, school district or other municipal
> corporation shall make any contract, unless the same shall be
> within the scope of its powers or be expressly authorized by law,
> nor unless such contract be made upon a consideration wholly to
> be performed or executed subsequent to the making of the contract;
> and such contract including the consideration, shall be in writing
> and dated when made, and shall be subscribed by the parties
> thereto, or their agents authorized by law and duly appointed and
> authorized in writing.

"The terms of this statute are expressly made applicable to counties, and the requirement that the terms of contracts therein referred to be in writing has consistently been held to be mandatory and not merely directory." Thies v. St. Louis County, 402 S.W.2d 376, 380 (Mo. 1966). "Also, it has expressly been held that an oral contract 'in violation of this statutory provision is void ab initio and cannot be rendered valid after the services are performed or work done.'" Id., citing St. Francois County v. Brookshire, 302 S.W.2d 1, 4 (Mo. 1957).

In Theis v. St. Louis County the plaintiff relied on an alleged collateral agreement to rescind a deed. The parties admitted that the collateral agreement was oral and never reduced to writing. The plaintiff did not seek to enforce the collateral agreement, which was void, or to obtain damages for its breach, but did seek to establish the existence of the collateral oral agreement and establish a breach of it by the county to provide the basis for rescinding the deed. The court cited R.S. Mo. § 432.070 and held that the alleged oral agreement was void for all

17

purposes and that there can be no breach of a void agreement. 402 S.W.2d at 380. In <u>St. Francois County v. Brookshire</u> the county sued to recover fees paid to an attorney who represented members of the county court in contempt of court proceedings against them. The court held that the county could recover the fees paid to the attorney for services rendered because the contract employing the attorney was void because it was oral. 302 S.W.2d at 4. In <u>City of Fenton v. Executive International Inn, Inc.</u>, 740 S.W.2d 338 (Mo. Ct. App. 1987), the city alleged that the defendants had promised to rebuild a roadway running through its property for use as a public street if the city passed the defendants' petition for rezoning. The court held that the city's breach of contract count was fatally defective because the alleged contract was not in writing, as required by R.S. Mo. § 432.070. <u>Id.</u> at 340.

The record does not contain the alleged 1953 loan agreement. Plaintiffs cite the bill of sale as a writing. The bill of sale does not contain the terms of the alleged 1953 loan agreement. What is required, and what is missing in this record, is documentation of the 1953 loan agreement, not the 1984 sale.

What remains is the County has possession of the locomotive. "It is well settled law that exclusive possession and control over property are circumstances that raise a presumption of ownership in the possession and anyone else claiming the property has the burden of proof." <u>Ross v. Pendergast</u>, 353 Mo. 300, 305, 182 S.W.2d 307, 309 (1944). Plaintiffs have failed to produce any evidence to challenge the County's presumption of ownership. The County is entitled to judgment as a matter of law.

Accordingly, the court dismisses the Friends and grants summary judgment in favor of the County.

Dated this 29th day of September, 2006.

*[signature]*

SENIOR UNITED STATES DISTRICT JUDGE