UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LACKAWANNA CHAPTER OF THE RAILWAY & LOCOMOTIVE HISTORICAL SOCIETY, INC. and THE FRIENDS OF THE NEW JERSEY RAILROAD AND TRANSPORTATION MUSEUM COMMISSION, INC., <br><br>Plaintiffs,<br><br>vs.<br><br>ST. LOUIS COUNTY, MISSOURI d/b/a Museum of Transportation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 4:04CV00734 SNLJ |

**MEMORANDUM OPINION**

This replevin action is before the Court on plaintiffs' and defendant's cross motions for summary judgment (#s 86 and 91, respectively) after remand from the Court of Appeals, Lackawanna Chapter of the Ry. & Locomotive Historical Society v. St. Louis County, 497 F.3d 832 (8th Cir. 2007). Plaintiffs seek return of a rare and historic steam locomotive, known as engine No. 952, currently displayed by St. Louis County at its Museum of Transportation. The following is the statement of the case taken from the Court of Appeals opinion, pp. 833-35:

I.

The parties to this suit, Lackawanna and St. Louis, are each successors to the entities that have owned and possessed Delaware, Lackawanna & Western Railroad's ("the Railroad") engine No. 952 over the past century. The Railway & Locomotive Historical Society ("Historical Society") is the national organization, incorporated in Massachusetts, which received No. 952 from the Railroad in 1939. The Historical Society transferred ownership of No. 952 to its Lackawanna Chapter in 1999, and that local society is thus the plaintiff-appellant here.

The National Museum of Transportation ("Transportation Museum") in St. Louis was a private non-profit corporation at the time it first displayed No. 952. St. Louis, the defendant-appellee here, exercised an option to acquire the Transportation Museum in 1984 after first acquiring through lease the museum's assets in 1979.

We recount separately the ownership of No. 952, possession of No. 952, and acquisition of the Transportation Museum by St. Louis.

A. Ownership of No. 952

In 1905 the Railroad's engine No. 952 entered service. No. 952, a now-rare "camelback" locomotive utilizing a wide firebox to burn anthracite coal, was retired in 1938 and thereafter began its second life as a stationary museum piece. On April 17, 1939, the Railroad transferred ownership of No. 952 to the Historical Society, for exhibition as a museum piece. The 1939 transfer of No. 952 from the Railroad to the Historical Society is documented by a written agreement, signed by representatives of both parties.

In 1999 the Historical Society gave No. 952 to its Lackawanna Chapter (the plaintiff-appellant here) and the Friends of the New Jersey Railroad & Transportation Museum (which transferred its interest in No. 952 to Lackawanna during this litigation). The transfer is recorded in a gift deed.

B. Possession of No. 952

Despite the Railroad's transfer of No. 952 to the Historical Society in 1939, the engine remained in the Railroad's possession. Then, in 1952, the general manager of the Railroad, W. G. White, notified the Historical Society that the Railroad's plans to sell or lease its back stop at Scranton, Pennsylvania, would require the Historical Society to relocate No. 952. According to correspondence in the record, the impending loss of the back stop lead the Historical Society to "'sound out' the proper authorities in St. Louis and see if they would be interested in adding this locomotive to their collection" if "that group would want it in the nature of a permanent loan." The Historical Society offered the locomotive to the Transportation Museum in 1953 for "permanent exhibition."

The documents relating to the 1953 placement of No. 952 at the Transportation Museum include only correspondence. After the Historical Society learned in October 1952 that the Railroad would soon be unable to store the locomotive on its rails, Charles Fisher, president of the Historical Society, offered No. 952 to the Transportation Museum. John Smith, on behalf of the Transportation Museum, responded in a November 1952 letter:

> [T]he members of the Board of Directors of the Museum of Transport have considered the matter of taking the Lackawanna Mother Hubbard No. 952, as temporary or permanent loan, if it is desired to send the locomotive here. Our group is unanimously in favor of accepting the engine for care and exhibition on a basis that will seem satisfactory in the judgment of the donor, for it is the purpose of this organization to preserve such items.

In subsequent correspondence, the Historical Society described the transfer as "permanent loan," and the Historical Society's 1954 President's Report stated that No. 952 would be "in the care" of the Transportation Museum in the "hope that 'her' wanderings will end." After receiving No. 952, the Transportation Museum undertook several immediate improvements, including restoring the paint and stenciling to No. 952's original design.

C. St. Louis's Acquisition of the Transportation Museum

The 1984 documents transferring the Transportation Museum's property to St. Louis include a warranty deed (for the real property) and a "Transfer Agreement and Bill of Sale" (for other property owned by the museum and property held by the museum subject to the rights of others). Regrettably, the record documents regarding the 1984 transfer do not mention No. 952.[1]

D. The Dispute Regarding Possession of No. 952

At some point in or before October 1990 the Historical Society began its efforts to regain possession of No. 952. The correspondence, which included, at times, the Department of the Interior, the National Parks Service, the Smithsonian's National Museum of American History, the Office of the County Executive of St. Louis, the Transportation Museum, and the Historical Society, is extensive. Evidently, the Historical Society hoped to return No. 952 to its original home in Pennsylvania, for display at the Steamtown National Historic Site at Scranton, and also feared that the Transportation Museum's alleged neglect was endangering the locomotive. After reportedly leaving it to rust on an uncovered and overgrown sidetrack, the Transportation Museum began an effort to better maintain and preserve

---

[1] The 1984 Transfer Agreement and Bill of Sale originally contained an "Exhibit 'B'", which listed "restricted property" that St. Louis agreed to accept subject to the "ownership rights of the persons listed on Exhibit 'B.'" Though the parties generally refer to the Transportation Museum's "restricted property," we have not located the exhibit listing the property in the record, nor have the parties relied on it, to confirm whether No. 952 was listed. We express no opinion on the impact of the Transportation Museum's listing of, or failure to list, No. 952 when it delivered its assets to St. Louis.

No. 952 in 1995, but that did not deter the Historical Society.

## II.

Lackawanna, as the successor to the Historical Society's interest in No. 952, first brought suit in the Middle District of Pennsylvania, though that court transferred the case to the Eastern District of Missouri. See Lackawanna Chapter of Ry. & Locomotive Historical Soc., Inc. v. St. Louis County, 2004 WL 503447 (M.D. Pa. Mar. 12, 2004). St. Louis soon moved for summary judgment, arguing that the correspondence did not constitute a written agreement that could support Lackawanna's claim for specific performance, as required for contracts with counties by Mo. Rev. Stat. § 432.070. St. Louis also asserted other defenses, including Missouri's five-year statute of limitations for breach of contract claims, adverse possession of No. 952 by the Transportation Museum, and abandonment by the Historical Society and Lackawanna.

The district court granted St. Louis's motion for summary judgment. The court first found that "[n]one of the documents establish a loan agreement between the RLHS [the Historical Society] and the [Transportation] museum setting forth the terms of the transfer of the locomotive in 1953." Next, the court observed that the available writings do not define "permanent loan." In the alternative, the court found that the Missouri statute of frauds, Mo. Rev. Stat. § 432.010, precluded interpreting the documents as an agreement. Finally, in the absence of an enforceable agreement, the court determined that St. Louis's possession of No. 952 created a presumption of ownership that Lackawanna did not rebut. See Ross v. Pendergast, 182 S.W.2d 307, 309 (Mo. 1944).

On appeal, the Eighth Circuit, applying Missouri law, reversed and remanded after determining 1) that the 1953 transfer from the Historical Society to St. Louis was in the nature of an "express or implied bailment for an indefinite period," Lackawanna Chapter, 497 F.3d at 836; 2) that "In the absence of a formal agreement, the indefinite bailment arises from the relationship between a lender and a museum and is terminable at will," id.; and 3) that "Because '[a] contract for bailment may be written, oral, express or implied,' [ . . .] St. Louis's statute of frauds argument is therefore without merit as it relates to the original bailment," id., at 837. On remand, the Court directed the District Court and the parties to address "other issues that must be resolved, including

operation of Missouri's statute of limitations[. . .] and the effect of transferring the Transportation Museum's bailed property to St. Louis." Regarding the latter issue, however, there is no dispute between the parties that St. Louis is the successor in interest to the Transportation Museum as bailee under the 1953 bailment from the Historical Society.

The question still to be resolved, then, is whether the statute of limitations has run against the Historical Society and in favor of St. Louis. The parties agree that the statute of limitations for replevin is five years, sec. 516.120 RSMo 2000, but they disagree when the cause of action accrued so to trigger the running of the statute.

In a replevin action, the cause of action accrues, and the statute of limitations begins to run, when the plaintiff makes a demand for the return of the property and the defendant refuses to return it. Hemar Ins. Corp. of America v. Ryerson, 108 S.W.3d 90 (Mo. App. E.D. 2003); Bollman Bros. Co. v. Peake, 69 S.W. 1059 (Mo. App. 1902). Here, defendant argues that the statute of limitation on plaintiff's replevin claim began to run in 1995 following the defendant's refusal to release the locomotive to the plaintiffs; to the contrary, plaintiffs contend that they made no demand for the release of the locomotive until May 2002. Because suit was filed in 2004, the five year statute would already have run under defendant's argument, but would not have run under plaintiffs' argument.

A party need not use the specific word "demand" when asking for the return of the property. 66 Am. Jur. 2d *Replevin* § 28 (2001) *citing* Feld v. Feld, 279 A.D. 2d 393 (1st Dep't 2001). Instead, a demand is simply "an assertion that one is the owner of the property and that the one upon whom the demand is made has no rights in it other than allowed by the demander." Feld, 279 A.D. 2d at 394-95. Similarly, refusal need not use the specific word "refuse." 66 Am. Jur. 2d. *Replevin* § 28 (2001) *citing* Feld, 279 A.D. 2d 393. What is important is that the possessor clearly conveys the

intent to interfere with the possessory interests of the owner. Id.; *See* also Sanderson v. Nunn, 259 S.W. 892 (Mo. App. 1924) (in a conversion action, if bailee wrongfully exercises dominion over property to the exclusion and in defiance of the rights of the bailor, the wrongful conduct terminates the bailment, entitling to possession of the property).

The record in this case sets out a significant amount of correspondence, corporate minutes, and reports dealing with the relationship between plaintiffs and the defendant concerning Locomotive No. 952. As the Court of Appeals observed, a dispute arose between plaintiffs and the defendant regarding the locomotive sometime in the late 1980s or early 1990s. Plaintiffs and their members began corresponding with defendant with the hope of having the locomotive moved to the National Parks Service's Steamtown in Scranton, Pennsylvania. Defendant repeatedly refused attempts to negotiate a transfer. Therefore, this Court must determine at what point in the correspondence there was a demand by plaintiffs for the return of the locomotive and at what point there was a refusal by defendant.

In that determination, the most persuasive evidence is found in the affidavit of William Howes, Jr., president of the Historical Society's Board of Directors, who stated:

> In 1995, R&LHS board member William Withuhn was authorized to begin negotiating with the museum to get the release of the 952, either through outright relinquishment, or through an exchange of another locomotive. William Withuhn's efforts on behalf of R&LHS to get the 952 released from the museum were not successful. . . . I attempted to persuade Mr. Schmidt [the Transportation Museum director] to release the 952, or agree to some kind of temporary loan . . . . The museum's answer in 1995 was that it was not interested in giving up the 952 from its collection.

This information is confirmed in the affidavit of museum director Schmidt who stated that he responded to Mr. Howes' demands by advising him that "the museum would not give up possession

of the 952, and that the museum intended to keep it." This evidence alone is sufficient to establish a demand and refusal.

In addition, there is a May 6, 1996, letter addressed to St. Louis County Executive Buzz Westfall from Historical Society member Perry Shoemaker, in which Mr. Shoemaker stated:

> You did not comment on the demand of the Railway & Locomotive Historical Society that its property - locomotive #952 - be released from the County Museum for movement to the National Park Service Historical Project called Steamtown at Scranton, Pennsylvania.

Then in response to this letter, Mr. Schmidt, the museum director, wrote to President Howes and acknowledged that the museum was only a "custodian of the engine," but stated that St. Louis:

> . . .accepted the 952 from the R&LHS under a <u>permanent</u> loan when the engine was threatened with extinction by the D&LW Railroad. . . . In the acceptance of this permanent loan from the R&LHS, rather than a transfer of ownership, the museum recognized that the important objective was to save the engine, not insist on ownership before transfer. The R&LHS has, by its uncertainty, contributed to the controversy and allowed the ownership to be an issue. We do <u>not</u> intend to relinquish this important artifact to some new location because of a regional interest. . . .

This exchange, too, is sufficient to establish a demand and refusal. Although the defendant did not expressly state it was refusing to return the property, it clearly interfered with plaintiffs' right to possession by stating that it did "not intend" to give up possession despite the Historical Society's request.

Plaintiffs counter this evidence by asserting that the corporate minutes of the Historical Society demonstrate that the Society was merely attempting to broker an agreement for a transfer of the locomotive to Scranton and not demand a release. They add that because the Historical Society is a corporation, it is bound by the actions of its officers and members only when those actions are within the express or implied authority delegated to them. *See* <u>Treasurer & Received General v.</u>

Macadale Warehouse Co., Inc., 160 N.E. 434, 436 (Mass. 1928).  However, as early as 1993 the Society had sent its president and other representatives to St. Louis to "jar the engine loose" and had permitted those persons to negotiate and correspond with defendant on its behalf.  Under these circumstances, there was at least apparent authority for those persons to act on behalf of the Society, and even if the Society did not intend to go so far as to demand relinquishment of the locomotive, they are now bound by the actions of their officers and representatives.  See Wynn v. McMahon Ford Co., 414 S.W. 2d 330; Essco Geometric v. Harvard Industries, 46 F.3rd 718 (8th Cir. 1995).

In sum, this Court holds that during 1995 and 1996 the Historical Society made multiple demands for the return of the locomotive and that the defendant refused to relinquish possession, thus interfering with plaintiffs' rights of ownership.  Whether measuring from 1995 or 1996, the statute of limitations for a replevin action had run before this action was filed in 2002, and thus, plaintiffs claim for replevin is time barred.

It is therefore ordered that summary judgment shall be granted in favor of defendant and against plaintiffs.

So **ORDERED** this 5th day of June, 2009.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE